## No. 21.—William D. Whitehead vs. Ira Peck.

Per Nisbet, Judge.

The action for money had and received is an equitable action, extensively remedial, yet it is subject to rules. It does not give to courts of law jurisdiction, which belongs to courts of equity.

It lies in a great variety of cases; but in no case, where there is not a contract, expressed or implied, between plaintiff and defendant; and there must be such a contract as creates a privity between the parties. It does not lie to enforce every imaginable equity between man and man, growing out of moneyed transactions.

It lies in all cases where money is in the hands of another, which, *ex æquo et bono*, the plaintiff is entitled to recover, and which the defendant is not entitled in *conscience* to retain. Yet this good and just right in the plaintiff, and this conscientious inability in the defendant, grow out of privity of contract either expressed or implied in law.

Usury paid by a surety may be recovered back by him, in this form of action, but not by the principal, though he has reimbursed the surety. There is no privity of contract either expressed or implied in law, between the principal and his creditor, in such a case.

If the surety have knowledge of the usury, and voluntarily pay it, he cannot afterwards recover it of his principal.

The payment of usury by the surety, and his subsequent reimbursement by his principal, do not, in law, constitute such surety the agent of his principal, by *ratification.*

Per Lumpkin, Judge.

When a security, who is indemnified by mortgage, voluntarily pays a usurious note, and is subsequently reimbursed by his principal, *in property*, the latter cannot recover of the creditor the excess of interest in an action for money had and received.

Whitehead *vs.* Peck.

This was an action of assumpsit for *money had and received*, the object of which was to recover usury back, tried before Judge Scarborough in Twiggs Superior Court, April Term, 1846.

It appeared in evidence on the trial, that in the early part of the year 1838, the plaintiff, through Henry Bunn, borrowed from the defendant $2,940, and gave his note, with Bunn as his security, for $3,500, to fall due on the 1st of January, 1839. That he renewed, for the year 1839, by giving a note for the usury of $700 ; and for the year 1840, by giving a note for the usury of $840. The note for the original loan, and also those given in renewal, were made payable to the defendant, and were subscribed by the plaintiff as principal, and the said Bunn as his security, whom the plaintiff secured by mortgages on property.

Before the maturity of the last note, given in renewal, Bunn took up from the defendant all of the said notes, amounting, in the aggregate, to $5,040, principal, and shortly afterwards, the plaintiff reimbursed him in property, and the notes and mortgages were given up and satisfied.

After the close of the evidence and the argument of counsel, the Judge of the court below charged the jury, amongst other things, that if Bunn paid defendant, even before the maturity of the note, and, subsequently, the plaintiff paid Bunn, to indemnify him as surety, plaintiff must fail in his action. That if plaintiff had paid Bunn, before he, Bunn, paid defendant, the law implied an agency of Bunn to plaintiff; but that here the proof was, that plaintiff paid his security after the security had paid the creditor. If a security pay an usurious contract, and subsequently, his principal pay him back the amount so paid upon the contract of suretyship, an action cannot be supported by the principal debtor against the principal creditor, for money had and received. That a security was not compelled to plead usury, but might pay the whole amount, and recover of the principal for so much money paid to his use. And the jury, under the charge of the court, found for the defendant.

To which the plaintiff's counsel excepted.

J. S. Dennard, for the plaintiff in error.

This is an action for money had and received. It is an equitable action. "It is deemed a species of equitable suit, and lies in all cases where, *in equity and good conscience, the plaintiff ought to have the money he seeks to recover, and the defendant ought not to retain it.*"—*Archb. N. P.*

In the language of Lord Mansfield : " This kind of equitable action, to recover back money, which *ought not in justice to be kept*, is very beneficial, and therefore much encouraged," &c.—*2 Burr.* 1012. Again, Lord Mansfield said, " I am a great friend to the action for money had and received ; it is a very beneficial action, and founded on principles of eternal justice. It is a liberal action, founded upon large principles of equity, where the defendant *cannot conscientiously* hold the money."

Justice Buller said, " The Court has very properly extended the action for money had and received ; it is founded on principles of justice, and I do not wish to restrain it in any respect ; but it must be remembered, that it was extended on the principle, of its being *a Bill in Equity.* And, therefore, in order to recover money in this form of action, the party *must show that he has equity and conscience* on his side, and *that he could recover it in a court of equity.*"

Now, as to the equity in this case, What would equity require Whitehead to do ? To pay the principal and legal interest. That he has done. He has gone farther ; he has paid the usurious interest also. He has done more than the broadest principles of equity could require. He stands before the court with clean hands, and asks equity. He asks for a recovery of that which has been extorted from him, contrary to equity, to conscience, and to law, and which the defendant in good conscience

ought to refund. And is it to be denied him? if so, upon what grounds? Because his security voluntarily paid it, with full knowledge that he was paying a debt contrary to conscience and to law? But it may be said that Bunn, the security, was responsible to Whitehead. Not so. Is it money which Peck is retaining from Bunn contrary to conscience? Is it money which Peck in conscience ought to refund him? Has Bunn any right *ex æquo et bono* to it? Is he the victim? Has he been the sufferer? His own testimony is, that Whitehead has paid him every dollar that he paid Peck. Who received this money, who has been benefited by it, and who is now reaping its benefits? Not Bunn. He did not make, or lose a dollar by it. But Peck is the one who received it, who now has it, and who ought not in conscience to retain it. If he ought not in conscience to retain it, who ought in conscience to have it? Not Bunn; he has no legal right to it. It is not his money. He paid it, it is true; but he paid it for Whitehead's use, and Whitehead reimbursed him. It is therefore Whitehead's money, in whom conscience, equity, and law, have vested the right.

I have referred to the liberal and equitable principles governing this action, as laid down by the English authorities. I will now refer your Honors to some American cases, which, instead of restraining those just and liberal principles, have extended them.—20 *John. Rep.* 293; 6 *Peters' Rep.* 19. Also in 17 *Mass. Rep.* 579, C. J. Parker says, "There are many cases in which this action is supported, without any privity between the parties other than what is created by law. Wherever one man has in his hands the money of another, which he ought to pay over, he is liable to this action, although he has never seen or heard of the party who has the right. When the fact is proved that he has the money, if he cannot show that he has equitable or legal ground for retaining it, the law creates the privity and the promise." Now, I ask, where has Peck shown any legal or equitable ground for retaining Whitehead's money? We prove that he has it. C. J. Parker says further, " As to any want of privity, or any implied promise, the law seems to be, that where one has received the money of another, and has not a right conscientiously to retain it, the law implies a promise that he will pay it over."—17 *Mass. Rep.* 562.

In the first transaction between these parties, Judge Scarborough decided Bunn was an agent. If an agent in the first transaction, he was in the last; for Lord Mansfield has decided, " that payment by one is payment for all ; the one acting virtually as agent for the rest ; and, in the same manner, an admission by one, is an admission by all."—*Balantine on Limitations of Actions,* 203.

The law fixes upon Bunn an agency, and only an agency in this whole matter so far as his acts are concerned, and it matters not whether he is considered the agent of Whitehead or of Peck, Whitehead is entitled to a recovery in this action. Agreeably to the decision of Lord Mansfield, cited in Bal. on Lim., Bunn, in paying the debt, was the agent of Whitehead. Then, agreeably to Lord Mansfield's decision in the case, cited in 2 *Cowper,* 808, where a man pays money by his agent which ought not to have been paid, either the agent or the principal may bring an action to recover it back. Either Bunn or Whitehead, therefore, could have brought the action against Peck.

" I admit," says Lord Kenyon, in the case of *Exall* vs. *Partridge and others,* 8 *T. R.* 308, " that where one person is security for another, and compellable to pay the whole debt, and he is called upon to pay it ; it is money paid to the use of the principal debtor, and may be recovered in an action against him for money paid, even though the security did not pay the debt by the desire of the principal."

Why is it that a security can recover from his principal? What reason does the law give? Because he has paid money to, and for the use of his principal. Does not this law make the security an agent, and does it not base his right of recovery upon the ground of his agency? Here the security, Bunn, paid Peck, the creditor, and the law says he paid him for the use of Whitehead. If he paid him for the use of Whitehead, Peck became the trustee of Whitehead, and now holds the money for Whitehead's use.

WILLIAM S. ROCKWELL, for the defendant in error.

The judges not being unanimous, they delivered their opinions *seriatim* as follows :—

LUMPKIN, Judge.

William D. Whitehead borrowed of Ira Peck a large sum of money at usurious interest, and gave Henry Bunn as security ; executing under his hand and seal, several mortgages on real and personal property to Bunn, to save him harmless in the premises.   Bunn discharged the *whole* of the debt ; a part of it before it was due.   Whitehead, when called upon, reimbursed his security *in property*.   The borrower now brought an action for money had and received against the lender, to recover of him the usury thus paid.   Judge Scarborough, before whom the case was tried, in Twiggs Superior Court, decided that the suit could not be maintained, and to reverse this judgment, this writ of error is brought.   The plaintiff in error insists that the payment by the security was a payment by the "principal ; the security being in law the agent of the principal, *quoad hoc.*

It may not be unprofitable to advert briefly to the history of usury. The Jews were permitted to lend to *strangers* upon usury, but it was not lawful for them to charge a *brother*—that is an *Israelite*—*any interest.*— *Deut.*, xxiii., 19 *and* 20.   The Romans allowed interest, but whether, at the time of the Twelve Tables, it was *one* per cent. or *twelve* per annum, is still a vexed question.   Tacitus, Gibbon and Pothier are authorities in behalf of the former opinion ; Livy, Montesquieu and others of the latter.   Anciently, in England, as in all other Catholic countries, not only was *all* interest prohibited, but the taking of increase on money was denounced as contrary to the laws of God, of nature and of the realm.   Having been tolerated among the descendants of Abraham, however—at least so far as to authorize it to be assessed on Gentiles—it would seem that it could not be in itself sinful.   Ever since the Reformation, the taking of interest has been expressly sanctioned by the British Parliament.

The Act of 37 *Hen.* 8, *Ch.* 9, (A. D. 1546,) was the first in England upon this subject ; it allowed 10 per cent.   It was repealed in 1551, but revived by the 13 *Eliz.*, *Ch.* 8, (A. D. 1570,) and 10 per cent. was again the lawful interest.   By this last statute all contracts are declared void which reserved more than the lawful interest on money.   The 21 *James* 1 (1623) reduced the rate of interest to 8 per cent.; and 12 *Charles* 2 (1660) to 6 per cent.; and 12 *Anne* (1713) to 5 per cent.; and any one violating its provisions incurred a forfeiture of treble the sum lent.

Usury has been viewed very differently, not only by the different States of the Union, but at different periods of the respective history of the same State.   In some it has been treated with great rigor, the law uniformly looking upon the borrower as the *victim,* and in no sense the *aggressor*.   In most of them there is a gradual relaxation respecting it ; and in some, they allow not only the principal and legal interest to be recovered, on usurious contracts, but suffer the parties to agree upon a higher rate than the lawful interest, under a certain maximun limit ; and this is denominated *conventional* interest.

It sounds very well to say of this practice, that men should be protected from it, *even against themselves.*   But the tendency of legislation is, to call in question that assumed guardianship which trenches upon freedom of action, by superintending and controlling the contracts of parties of sufficient age and understanding to make them, and transacting business with their eyes open.   " One thing is very certain," says Jus-

tice McLean, in delivering the opinion of the Supreme Court, in the case of *Lloyd* vs. *Scott ;* "namely, that the Act of Usury has long since lost that deep moral stain which formerly attached to it, and is now generally considered only as illegal, because it is prohibited."

The plea of usury was rare in the South previous to the late revulsion in monetary matters; and since 1837 it has been restricted pretty much in Georgia to particular districts of the State. In one way I am satisfied that it has operated beneficially; that is, in driving capital into internal improvements—agricultural, manufacturing, and industrial pursuits. Still I see no sufficient reason for singling out money-lenders and heaping opprobrium upon them as the greatest culprits in the community. They may be as inexorable as Shylock, and the more selfish and callous, from the fact that they earn their living by dealing directly in money, the love of which is the root of all evil. But observation has convinced me, that *all* who *will be* rich, whether usurers or land-jobbers or speculators or any other class, they that *will be rich*, that have made up their minds to accumulate property, aside from the ordinary employments of life, fall, not only into divers temptations and snares, but soon become almost, if not altogether, regardless of the means by which they seek to attain their end. The evil resulting from the prevalent practice of pleading usury is, greatly to weaken the sense of obligation for the performance of contracts generally, and to demoralize individual character. Sitting as a court, we have nothing to do but to carry into execution, calmly and dispassionately, the will of the people as disclosed by the laws upon this subject. With the justice or injustice, policy or impolicy, morality or immorality, of these laws, neither jurors nor judges may interfere.

Our first provincial Act against usury was passed in 1759. It fixed the rate of interest at 8 per cent.—at which it continued down to 1845—almost a century. It embraces substantially, the various provisions of the several English statutes then in force. The act of 1814, only prescribed the mode of computing interest, and did not affect at all, the question of usury. The act of 1822 made a material innovation on the old law. It declared expressly that usurious contracts *should not be void,* but that the principal due thereon should be recoverable *at law,* and no more. The 2d Sec. relieves the lender from all forfeiture. Under this act, it may well be seriously doubted whether usury *voluntarily* paid, can be recovered *of,* or *by* anybody. Under the act of 1759, it was clearly recoverable, because paid upon an illegal and void contract. "It has been said," observes Lord Bacon, (7 *Bac. Abr.* 204) "that though the statute does not go so far as to make the party receiving the usurious interest liable to refund, yet having prohibited taking beyond such a sum *and avoided the contract,* the taking is a breach of the statute, and the actual receipt of the money will (in a Court of Equity) make him liable to refund," (*Cas. Tem. Talb.,* 38 & 114.) Now we yield our entire assent to this proposition. And had the 1st sec. of the act of 1822, simply declared that the principal *only* of usurious contracts should be recoverable at law and no more—still these contracts having been rendered void by the act of 1759, extra interest paid thereon might have been collected. But this suggestion is met by the broad enactment, that such contracts, although they may provide for the payment of a larger premium than 8 per cent. for the loan of money, are nevertheless, not on

that account void.   What then ?   Can the borrower, if he pay the money of his own accord, get it back ?   Upon what principal can he reclaim funds advanced on a *valid* contract ?   If he refuse to fulfill his promise, and suit has to be brought in that court, the *principal only* can be recovered, and this would appear to be the only risk which the creditor runs.   The act of the last General Assembly, reducing the rate of interest to 7 per cent., changes vitally the phraseology of its predecessor of 1822.   It pronounces usurious contracts *absolutely void, and of no effect,* except so far as to authorize the recovery of the principal due thereon, and no more.   Under the act then of 1822, is not the party brought within the principle *volenti non fit injuria ?*   Were this a new question, I should incline strongly to that construction, and that Mr. Whitehead would be remediless, had he paid the excess himself to Mr. Peck ; and *a fortissimo* when it was paid by another.   A contrary cotemporaneous interpretation having been established by the courts, and received and recognized as the law of the land for nearly a quarter of a century, this court felt unwilling to disturb it.   In the case of *Winkler* vs. *Scudder,* (decided during the present term, see p. 108,) it acquiesced in the prevailing construction.   I shall proceed, therefore, to examine this case on other grounds : for while it is conceded that this court has the right and authority to consider any point, so far as settled by our domestic adjudications, *only* as *res integra,* and to expound the law for itself, and will exercise them whenever the occasion demands it ; yet when a principle has been settled, by a long series of decisions, and uniformly sanctioned throughout the various circuits, and has governed the conduct and regulated the business of our people for a length of time, it would almost have acquired the force of a law ; and, if abrogated, better that it should be done by the law-making department of the government.

I had great doubt upon the hearing of this cause.   My mind is now better satisfied, although not free from embarrassment.

It is assumed by counsel for the plaintiff in error, and very correctly, that the action of assumpsit is likened to a bill in equity, and is the proper remedy, wherever the defendant has received and obtained possession of the *money of the plaintiff,* and which in equity and good conscience he ought to pay over, the *plaintiff having the legal right to demand the same.* Was the money sued for, the *money* of *Whitehead ?*   If so, Bunn, offered as a witness by the plaintiff, and the only one introduced, *perjured himself,* for he swore that he paid the debt to Peck with *his own money,* which was afterwards replaced by Whitehead, *in property.*   Here then is one difficulty in the case.   But there are others.   Had the debt to Peck been discharged directly by Whitehead, *in property,* his right to recover for money had and received would be very doubtful.   The authorities all concur that the payment, to entitle the plaintiff to succeed in this form of action, should originally have been made in money, or that which the parties have agreed to treat as money—or, if originally goods, sufficient time must have elapsed with the concurrence of circumstances, to justify the inference that they have been converted into money.—*Peake's. Cas.* 43 ; 4 *T. Rep.* 687 ; 3 *Bos. and Pul.* 589.   In *Taylor* vs. *Higgins,* (3 *East* 169,) the Court of King's Bench say, " It seems to be a rule, that under a count for money paid it must appear that money was actually advanced."   Lord Mansfield, whose *liberality* of view was proverbial, always

**10**

making mere technicality yield to the justice of the case, in *Nightingal et al.* vs. *Devisme*, (5 *Burr.* 2592,) says, " We are all of the opinion that the action for money had and received for the use of the plaintiff, will not lie in the present case, where no *money* was received. The proof in this case was that 500*l.* of East India stock had been transferred to the defendant for the use of the plaintiff.

The same doctrine is held by the court of appeals in Kentucky, in the case of *Lucket* vs. *Bohannon*, (3 *Bibb*, 378,) which was an action of assumpsit for money had and received.—See also 8 *Johns. Rep.* 202. Some modern cases have decided that this species of action could be maintained where bank bills or bills of exchange had been received, but it was on the ground that they were money.

The rule thus established is founded in wisdom. Suppose that Whitehead had compounded with Peck, and settled with him at fifty cents on the dollar, or any other sum less than the principal and legal interest, or, what is equivalent in principle, had transferred to him property in satisfaction of the claim, at fictitious prices, more than double its real value, could he have maintained this equitable action for the usury thus *nominally* accounted for? I apprehend not; nor can Whitehead escape the rule, because he sold the property to Bunn instead of Peck. Whitehead conveys to Bunn certain property in discharge of *his own indebtedness* (*and that too by mortgage*) to the purchaser, and then seeks on that consideration to raise a liability from Peck, for *money* had and received to his use; or, to present the proposition in a different form : Peck, it is alleged, has received of *Bunn* money, which he ought not in justice and good conscience to keep. Whitehead has reimbursed Bunn in property and, *therefore*, Whitehead is entitled to recover back, not *his own*, but *Bunn's* money from Peck. With all possible respect for the argument, I must think that this is a *non sequitur*—a conclusion not warranted by the premises. It by no means follows that every one who gets money illegally is bound to *refund it*. Had the usury in controversy been collected by judgment and execution, the impropriety of withholding it would be just the same as before the action was brought, and yet it will not be pretended that it could be then reached. The law in its humanity goes far to extricate the unfortunate borrower, even from the ruin which he has wilfully brought upon himself. It knows our infirmity, and compassionates the situation of the debtor, who, deluded by hopes of better times, will consent to any terms, and seize with avidity upon any proposition, however exorbitant, provided it affords the means of present relief. And yet, if the borrower neglect or refuse to avail himself of his defence when sued, the courts, anxious and astute as they are to detect and prohibit the enforcing of usurious contracts, will close their doors against his prayer for relief, and turn him off to battle it as best he can with his unfeeling creditor. If money then *illegally obtained* may be withheld from its true and rightful owner, much less shall it be subject to the suit of any one who sees fit to demand it.

Bunn, constrained by an honorary obligation, more sacred in the opinion of many men than any *mere* legal sanction, being willing and able to pay, and feeling, under the circumstances, that he would be disgraced by refusing to pay—as the money was lent upon the confidence reposed in him—(he negotiated the loan, says Judge Scarborough, in his written

opinion—Peck saying that he would have nothing to do with Whitehead, when applied to by Bunn to get the money,) discharged the debt to Peck with a full knowledge of its original turpitude. He had ample notice of the taint which attached to it. He did it without compulsion of law. If there be guilt in the transaction, he is completely identified with it—in its inception—in its consummation. That Whitehead might have resisted a recovery, at the instance of Bunn, 1 am quite clear; notwithstanding the decision in *Ford* vs. *Keith.*—1 *Mass. Rep.* 139. That he might not still have recourse on Bunn, if the facts of his case do not otherwise bar him, I am not fully convinced.—*See Reed* vs. *Smith,* 9 *Cowan's Rep.* 647 ; *Kent* vs. *Walton,* 7 ; *Wend. Rep.* 257. But that he has sought his remedy of the wrong person—of one to whom he never paid a dollar, either personally or by attorney—is the deliberate judgment of this court, after the most thorough reflection upon the case.

But it is urged, and with much plausibility and earnestness, that Bunn acted as the agent of Whitehead, in the settlement of the debt; and this is implied from the fact of his securityship. But Bunn himself, in his testimony, expressly repudiates the agency ; and does not every feature in the transaction corroborate his proof? Does he not demand reimbursement at the hands of his principal? And does not this fact negative the imputed relationship? Did he not assert his rights as mortgagee, upon forfeiture of the condition in these instruments to protect him as *security* ? And does Whitehead attempt to oppose his claim, upon the pretext that he acted merely as his substitute in the transaction? On the contrary does he not recognize and discharge it by a surrender of the property ? And this position is greatly strengthened by the very ingenious suggestion of the learned counsel for the defendant, namely : that Bunn's remedy by assumpsit against Whitehead, for money paid, was merged in the higher security, by mortgage ; and that the settlement of that *specialty debt* by Bunn and Whitehead, *in property,* could have had no legal connection with the settlement of the simple contract debt between Bunn and Peck. I think there is no foundation, from any rule of law so to consider it.—2 *Term Rep.* 100 ; 8 *Taunt.* 365.

But, surmounting all those obstacles, the plaintiff in error, I think, must fail for want of the necessary *privity* between himself and Peck, to enable him to maintain his action. It is unquestionably true, as a general rule, that a *stranger* to an agreement cannot sue in his own name.—*Williams* vs. *Everett and others,* 14 *East. Rep.* 582. But there are exceptions to the rule ; and it has been decided that it is immaterial from whom the consideration passed, if it be a sufficient foundation for a valid promise. If A delivers money to B for the purpose of being paid over to C, C may maintain an action against B for the money. The person to whom the promise is to be performed, though not the party contracted with, being the meritorious cause of it, can take advantage of the promise.—*Con. Rep.* 443 ; 3 *B. and P.* 149, *n.* (*a*) ; 2 *D. and R.* 277 ; 4 *B. and C.* 664 ; 17 *Mass. Rep.* 575, 579 ; 3 *Pick.* 92 ; 13 *John. Rep.* 497 ; 22 *Am. Jur.* 16, 19 ; *Chit. on Plea,* 5 ; *Chit. on Con.* 45, 48 ; *Ham. on Par.* 8, 9 ; *Story on Agency,* 393, 394. But the obvious answer to all those cases is, that the *money,* or *property,* sued for belonged to the *plaintiff.* It must be proved either that the plaintiff was the person with whom the contract was made, or that he was the party legally and really interested

in it when made.—1 *East.* 497; 8 *T. R.* 332. Plaintiff having an equi table interest in the contract is not sufficient; therefore a *cestui que trust* cannot sue.—*Allen* vs. *Jenlett, Holt,* c. 641. Money deposited with a stakeholder can only be recovered from him by the person *legally* entitled thereto.—13 *East.* 20. The plaintiff, Whitehead, had no *legal right* to the money paid by Bunn to Peck. In one sense, it is true that it was paid *to his use,* as it was appropriated to the joint note of Whitehead & Bunn, but not *to his use,* in the meaning and spirit of the foregoing cases. Whitehead had no agency nor participation in the transaction between Bunn and Peck. As to the idea that the subsequent settlement, upon the mortgages, was a ratification and adoption of the previous agency, install- ing Whitehead into the shoes of Bunn, and thereby constituting him the creditor of Peck—the fallacy of it, as I humbly conceive, lies in identify- ing principal and *surety* with principal and *agent;* relations which, in point of law, are very dissimilar. Agency must be antecedently given, or be subsequently adopted; and, in this latter case, there must be some act of recognition.—2 *Kent Com.* 614. *But where the act of the agent is intended to affect a third person, it is necessary to prove an express authority given to the agent at the time he acted, and no subsequent sanction of the principal* will give it effect.—5 *East.* 498; 3 *Chit. Com. L.* 206. The rule of law, that *omnis ratihabitio, retro trahitur,* &c., seems only applicable to cases where the conduct of the parties on whom it is to operate, not being refer- able to any agreement, cannot, in the mean time, depend on whether there be a subsequent ratification.—5 *East.* 500. A person, by an assumed agency, and without any assent or acquiescence to the act, cannot bind another, *nolens volens,* however useful and necessary the act may be. But a surety has a right to see to it that the debt for which he is bound is paid. And if he satisfies the creditor, to relieve himself, which he may do with- out the consent of his principal, still it is money paid for his use, to recover which an action will lie. Does the relation of principal and surety create such an agency that the acts and admissions of the latter would bind the former, though he should subsequently so far confirm the deed of his surety as to refund the money paid on his account? Numerous other points of dissimilarity might be adduced, but we forbear.

The court is of the opinion that as neither principal nor security was bound to pay the excess of interest, Bunn, by *voluntarily* paying money upon a usurious agreement, which he himself had negotiated, could not compel Whitehead to refund. It could not be money paid to the use of the principal, as Bunn paid it with a full knowledge that it was illegal. That without notice from his principal, forbidding its payment, he was under obligation at his peril to resist it. And without expressing any opinion as to what might have been the rights of Whitehead as against Bunn, had the payment to him been *in money* and not *in property,* we hold that Whitehead cannot maintain *assumpsit* against Peck, for money paid to Peck by Bunn, and which it is not pretended was the money of Whitehead, merely because Whitehead afterwards discharged, *in property,* the liability imposed upon him by operation of law in favor of his security. No precedent has been produced to warrant such a pro- ceeding.

Wherefore the opinion of the court below must be affirmed.

NISBET, Judge.

Upon the question made in this case, very little direct authority is to be found. It is to be decided, therefore, upon general principles  The court being compelled to give judgment at Hawkinsville, before the expiration of the Term, and having then access to but few books, I felt great doubt as to the correctness of the judgment rendered.  That doubt was strengthened by the dissentient opinion of my learned brother, Warren.  Since I have had an opportunity of looking into the subject with some carefulness, I have become reconciled to the judgment, and although there is obviously in the case some conflict of principles and authorities, I must think the judgment of the court was right—right both upon principle and authority.

The facts are few.  Whitehead, the plaintiff in error, through Bunn, who was his surety, negotiated a loan from Peck, the defendant, at usurious interest.  Before the maturity of the note, and with knowledge that it was tainted with usury, Bunn paid it in full to Peck.  He was at the time secured against loss as surety, by a mortgage from Whitehead, his principal.  After payment to Peck, Whitehead reimbursed Bunn in property.  These facts establish that the contract was usurious; that Bunn had knowledge of that fact, and that the payment by him of the usurious interest was voluntary.  Whitehead brought his action of assumpsit, for money had and received, against Peck, for the usurious interest paid by Bunn.  The question is, is he entitled to recover ?  I think he is not.  This I know is an equitable action, and is extensively remedial, yet it is subject to rules.  It does not give to courts of law jurisdiction which belongs to courts of equity.  It lies in a great variety of cases, but in no case where there is not a contract, express or implied, between plaintiff and defendant ; and there must be such a contract as creates a privity between the parties.  It does not lie to enforce every imaginable equity, between man and man, growing out of moneyed transactions.  It lies in all cases where money is in the hands of another, which ex æquo et bono, the plaintiff is entitled to recover, and which the defendant is not entitled, in conscience, to retain.  Yet this good and just right in the plaintiff, and this conscientious inability in the defendant, grow out of privity of contract, either express or implied, in law.—1 Wheat. Selwyn. 103 ; 14 East 582 ; 4 B. & Ad. 612 ; 1 Cr. & Jor. 83 ; 17 Mass. 579 ; 7 Taunt. 339 ; 1 R. & M. 68 ; 3 R. & A. 643.

Between Whitehead and Peck, there is no express contract.  Is there any implied in law ?  In cases where the borrower pays the usurious interest himself, the statute against usury, and the fact of payment, create a contract.  There is in the transaction a direct relation between the parties, viz : privity.  The money is paid by the plaintiff, and is received by the defendant for his use.  It is the money of the plaintiff which he holds, and it being received, against the statute of usury, he cannot retain it in conscience.  Ex æquo et bono, the plaintiff is entitled to it.  In that case, the borrower could certainly recover.  Upon the note, there is a contract between Whitehead the maker, and Peck the holder, so long as it remains in his hands.  But so soon as the surety steps in and pays the debt, Peck is entirely dismissed from it—his rights in it cease, and

the surety is subrogated to all the rights of the holder. This position is not necessary to be sustained by authority ; so that the payment by the surety, so far from creating a privity between the maker of the note and the holder, does in fact destroy that which before existed. It does more : it creates new relations between the surety and the holder, incompatable with the plaintiff's right to recover. There is a contract implied in this case, between the surety and the holder, by virtue of the statute and the fact of payment; a direct relationship which constitutes privity. It is the money of Bunn, the surety, which Peck has received, and he has received it to Bunn's use. The unconscientiousness of the retention of it, has reference to Bunn, and not to Whitehead. The indebitatus is as to him, and it is to him that the law makes the assumpsit. What reply could Peck make to an action for the usurious interest by Bunn ? I know of none which would be available. Bunn, if sued by Peck, the lender, on the usurious contract, could plead the usury, (*Blydenburg*, 107,) and if so, having paid it voluntarily, he can recover it back in an action for money had and received. It would not be competent for Peck to plead that Bunn had been reimbursed by Whitehead. He would not be permitted to go out of his own contract with Bunn, and inquire into his (Bunn's) relations with his principal, for a defence. If Bunn, being reimbursed by Whitehead, should still recover the usurious interest out of Peck, what then ? Why, then an action would probably lie for it against him in favor of Whitehead. Whitehead would at all events have an equity in this money, which he could assert in chancery or at law Now, can the payment of the money create, by implication, two contracts at the same time ? Can this usurious interest be recovered both by Bunn and Whitehead ? Is Peck liable to Bunn, and if he is, is he also liable to Whitehead ? Can he be liable to both, at one and the same time ? I apprehend he cannot be. And this view of the matter satisfies me that there is no contract, no *privity*, between Whitehead and Peck, and that the former ought not to recover against the latter. If this question be tested by the rules of pleading and evidence, I cannot perceive how the plaintiff could ever make out his case against the defendant. The facts do not expressly, or by implication of law, create an assumpsit on the part of Peck. Without *that*, the action of assumpsit cannot be sustained. Again, one of the first rules of pleading is, that the action shall be brought by him who holds the legal interest in the contract. If I am right in my view of the subject, Bunn, the surety, has the legal interest here. The plaintiff by his own evidence has shown this, according to my view of this record, and has therefore proven himself out of court. It has been stated already that a surety, having paid the debt of his principal, is subrogated to the rights of the creditor against him. He cannot, however, be subrogated to more than the creditor's rights. The creditor could not have recovered the usurious interest from the maker, if he (the maker) had plead the statute of usury, in an action upon the contract. Could, therefore, Bunn have recovered this excess of interest out of Whitehead, his principal ? Was it not his duty to have awaited a suit, and plead the usury ? Knowing, as he did in this case, that the contract was tainted with usury, was not this necessary to his own protection ? And was not his voluntary payment of the usury an act of his own wrong, which would preclude him from recovering it from his principal ? We have seen that

the surety may set up the defence of usury.   In a case like the present, where the surety is cognizant of that defence, it strikes me that he fails to make it at his peril.

The rights of the principal are involved. The surety had no right by a voluntary payment to charge his principal with usurious interest.   It was competent for him to protect him, and it was his duty to do it. Suppose that Whitehead had not refunded to Bunn the illegal interest, and he had sued Whitehead for it, could not the latter have plead Bunn's knowledge of the usury in the contract, and his obligation to have set it up in defence against the creditor ?   It is so decided in several instances, and decided contrarywise in one case in Massachusetts.    Blydenburg holds this language, upon the authority of what is called *Potkin's case*, 8 *Leonard*, 63 ; to wit :  " But it seems that if the surety of the borrower at usurious interest have an opportunity to make his defence in a suit upon the original usurious bond, and omit to plead, he cannot afterwards recover of the borrower upon his counter-bond of indemnity, but shall be punished for his neglect."—*Blydenburg*, 102.   In *Cro. Eliz.* 588, a precisely similar case was decided contrary, but upon the ground that the surety might not have known of the original contract being usurious, in time to make his defence, sustaining the position, that if he had known of the usury in time to plead it, he could not have recovered against his principal.

Justice Glanville, upon the authority of Noy, is reported to have said, " It would be a dangerous precedent to avoid the statute of usury ; for the surety might be a friend of the usurer, who would not plead the statute, and so the statute would be to little purpose.—*Blydenburg*, 102 ; *Noy*, 73. It is something more than surmised that in this case the surety was the friend of the usurer.   The writer on usury, Blydenburg, before quoted, remarks that the principle of Potkin's case has been followed in the United States.  It was followed in *Moore's Exrs.* vs. *Vance*, 3 *Dana*, 362.   In *Ford* vs. *Keith*, 1 *Mass.* 139, it is decided that the surety may recover against the principal the usurious interest voluntarily paid.   In this case, the counsel for the plaintiff in the argument put his right of recovery on the ground that he had no notice of the usury, and therefore could not have plead it.   The court, however, ruled that with or without notice he could recover.  It does not seem to me that this authority is consonant with reason ; it is in conflict with the common law. Now, if I have shown that Whitehead might have successfully defended himself against the recovery of the usurious interest on the part of the surety, it follows that his voluntary refunding it to him, was an act in his own wrong from which he can take no benefit ; and it farther results as a consequence of this wrong act, that he has no equity against Peck, the lender.   It is not true, *ex æquo et bono*, that he is entitled to this money at the hands of Peck.

But it is argued that this case turns upon the doctrine of agency ; that Bunn acted in paying the debt as Whitehead's agent, and therefore it is his act ; that a subsequent ratification is the same with a prior appointment, and that the maxim " omnis ratihabitio retro trahitur et mandato priori æqui paratur" applies.   The doctrine of ratification is not questioned, but it is not apparent how the law of agency can govern this case. If, indeed, Bunn was Whitehead's agent, the privity is established, and

the action is sustainable.   But it does not appear from the facts disclosed by the record, that he purported to be his agent, or that he assumed to be his agent, or that he was considered by Peck his agent.   On the contrary, it does appear that he was his surety ; that he was equally bound with him to Peck ; that in *consequence of this liability,* acting for himself and in *his character of surety,* and with a view *to his own protection,* he made this payment.   Now, is it possible that the subsequent reimbursement by Whitehead can abrogate all the relations of the parties, or set them aside, and introduce new relations ?   By what law are the rights of these parties determinable ?   By the law of principal and surety, or that of principal and agent ?   They are manifestly different, viewed as principal and surety, from what they are as principal and agent.   To subject them to the law of both relationships would be an absurdity.   We must elect between the two.   And can we presume an agency, to the exclusion of all the rules which are so well settled, as applying to principal and surety—maker and endorser ?   If, in this case, the court can travel out of the record, and presume an agency, then may courts of justice do the same thing, in every case where a surety or an endorser takes up the paper of his principal.   Had a stranger to the contract volunteered the payment of the debt, usury and all, and Whitehead reimbursed him, he would have been an agent by ratification, and this action would lie.   Since Bunn was no stranger to the contract, but a party to it, and as there was no evidence of his acting with the means, or by the authority of Whitehead, we must presume that he acted on his own account, and with a view to his own interest.

Whereupon the judgment of the court below was affirmed.

WARNER, Judge, dissentient.

I cannot concur in the opinion delivered by the majority of the court in this case.   It appears from the record, in the fore part of the year, 1838, Peck, the defendant, advanced as a loan upon the note of plaintiff, with Henry Bunn, security, the sum of $2,940 00, the note being drawn for the sum of $3,500 00, payable to Peck, the defendant, to become due on or about the 1st January, 1839.   About the time the note for $3,500 00 fell due, the plaintiff renewed, by giving a note for $700 00, to fall due on or about the 1st January, 1840.   The plaintiff renewed a second time by giving a note for $840 00, to fall due on or about the 1st January, 1841 ; the plaintiff, Whitehead, indemnifying Bunn, his security, by mortgages on property.   The amount of the first note for $3,500 00, and the other two notes when added together, make the sum of $5,040 00.   Before the maturity of the notes given on the last renewal, Bunn as *the security* of the plaintiff, took up all the notes which had been given to the defendant by Whitehead as principal, and to which he was the security, amounting to the aforesaid sum of $5,040 00 ; and afterwards, before the last note given in renewal fell due, the plaintiff, Whitehead, paid Bunn, his security, the aforesaid sum of $5,040 00 in property.   The plaintiff instituted his action for money had and received against the defendants, to recover back the *usurious* interest.   There is no contest as to the fact of the transaction being usurious.   The defendant has received a large amount of money, which, according to the laws of

his country, he is not entitled to retain ; but it is contended, inasmuch as the defendant did not receive the usurious interest from the *hands* of the plaintiff, Whitehead, but from the *hands* of Bunn, his security, there is no *privity* between the plaintiff and defendant, from which the law will imply an obligation to repay the money. The court below charged the jury, " That if Bunn, plaintiff's security, paid Peck even before the maturity of the note, and subsequently, plaintiff paid Bunn to indemnify him as security, *the plaintiff must fail.* But if plaintiff had paid Bunn before Bunn paid defendant, Peck, the law implied an agency of Bunn to plaintiff, Whitehead ; but here the proof was, plaintiff paid Bunn, his security, after the security had paid the creditor."

Before I proceed to consider the charge of the circuit judge, I will for a moment advert to the legal character of an action for money had and received. The action for money had and received, is an equitable action. " Whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by the ties of natural justice and equity to refund, it may be recovered from him in an action for money had and received to the plaintiff's use. This form of action has been of late years extended, on the principle of its being considered like a bill in equity ; and therefore, in order to recover on a count for money had and received, the plaintiff must show, that he has equity and conscience on his side, and that he could recover it in a court of equity."—1*st Leigh's Nisi Prius,* 44 ; *Moses* vs. *McFarlane, 2d Burrow's Rep.* 1012 ; *Straton* vs. *Rastall, 2d Term Rep.* 370. In Moses *vs.* McFarlane, it is said, " This kind of equitable action to recover back money which ought not in justice to be kept, is *very beneficial,* and therefore *much encouraged.* It lies for money got through imposition, express or implied, or extortion, or *oppression,* or an *undue advantage* taken of the plaintiff's situation, contrary to laws made for the protection of persons under those circumstances." In Straton *vs.* Rastall, Buller, Judge, says : " In conscience, he only who received the money ought to be obliged to pay it back; and a court of equity would inquire in this case, *whether the party had received the money or not.*"

In the case under consideration, there is no controversy as to the fact that Peck, the defendant, received a large amount of money by way of usurious interest, in payment of Whitehead's notes, from the hands of Bunn, his security, which the law forbid him to receive and retain. If this large amount of usury had been paid into the hands of Peck by the plaintiff himself, it is conceded the plaintiff, Whitehead, might have recovered it back in this form of action, the parties not being, in the eye of the law, *in pari delicto.* Would not a court of equity, on the facts disclosed by the record in this case, decree the payment of the money, now sought to be recovered, to the plaintiff ? Would not the fact that Peck had received the money in payment of Whitehead's note from Whitehead's security, which had been refunded to Bunn, the security, by Whitehead, raise such an equity in favor of Whitehead as would entitle him, in a court of equity, to a decree for the amount in the hands of the defendant, so wrongfully and unjustly received by him ? If it would not so decree, then I am frank to confess, I have been greatly mistaken as to the powers and duties of a court of equity. If a court of equity would decree the repayment of the money, on the state of facts presented, then,

as we have seen, the action for money had and received is maintainable.

I will now proceed to examine the charge of the court to the jury. The court states the law to the jury to be, " that if the plaintiff had paid Bunn, before Bunn paid defendant, Peck, the law implied an agency of Bunn to plaintiff Whitehead." As I understand this part of the charge, the court intends to be understood as saying, that if Whitehead first paid the money to Bunn, and then Bunn paid it to Peck, Bunn paid the money as Whitehead's agent, and the plaintiff would be entitled, under the law, to recover, on the ground that payment by the agent is the same as payment by the principal. To this part of the charge of the court I yield my assent. But the court also charged, " that if Bunn, plaintiff's security, paid Peck, even before the maturity of the note, and subsequently, plaintiff paid Bunn, to indemnify him as security, *plaintiff must fail.*" This part of the charge of the court, when applied to the facts of this case, necessarily defeated the plaintiff's right to recover. Was the charge of the court correct, in contemplation of law ? I first propose to examine the question of *agency*, without regard to the relation of principal and security existing between Bunn and Whitehead. It is admitted, if Whitehead first paid the money to Bunn, and then he paid it to Peck, Bunn was the *agent* of Whitehead in making the payment. But is there any difference in law, between an *antecedent* authority given to make the payment by Whitehead to Bunn, and the *ratification* of the payment subsequently, of Bunn, by Whitehead ?

The authorities recognize no such distinction, as will be readily discovered by reference to them. " If I make a contract in the name of a person who has not given me an authority, he will be under no obligation to ratify it, nor will he be bound to the performance of it. But if, with full knowledge of what I have done, he ratify the act, he will be considered to have contracted originally, by my agency; *for the ratification is equivalent to an original authority.*"—1*st Livermore on Agency,* 44; 2*d Kent's Com.* 614; 2*d Greenleaf's Ev.* 46 ; *Maclean* vs. *Dunn,* 15*th Com. Law Rep.* 129. The maxim of the law is, that " *every consent given to what has been already done, has a retrospective effect, and equals a command.*" If Bunn, without the knowledge of Whitehead, advanced the money to Peck, and took up Whitehead's notes, and afterwards, with a full knowledge of all the facts, Whitehead ratified the transaction, as it appears he did do, by repayment to Bunn the full amount he had paid Peck, then Bunn was as much Whitehead's agent, in making the payment, as if Whitehead had first paid the money to Bunn, and then Bunn had paid it to Peck. In contemplation of law, Bunn was as much the *agent* in the one case as the other. Certainly, it does not lie in the mouth of the defendant to object, Bunn was not the agent of Whitehead, in making payment and taking up Whitehead's notes, when Whitehead himself has adopted and ratified his acts as such agent, and reimbursed him the full amount paid to Peck. But, it may be said, the payment to Bunn by Whitehead was made in property. If parties agree to take property in lieu of cash, it is a good payment.— *Peters* vs. *Barnhill,* 1*st Hill's Carolina Rep.* 234. Payment of a money debt, as surety or endorser, by conveying land which is received at the time as payment, will support the count for money paid, laid out

and expended.—*Ainslie* vs. *Wilson*, *7th Cow. Rep.* 662; *Bonney* vs. *Seeley*, *2d Wendall's Rep.* 481. The defendant, in this case, can derive no aid whatever from the fact, the payment by which Bunn was reimbursed was made in property. If the parties thought proper to treat the property as cash, they had a legal right to do so, and such payment, in judgment of law, will be considered as a *cash payment.* The payment of the money by Bunn to Peck, having been adopted and ratified by Whitehead, subsequently, and Bunnre imbursed therefor, Whitehead is entitled, both in law and equity, to recover the amount of usurious interest from Peck, who received it, equally as if the money had been paid directly by Whitehead to Peck, out of his own hand; and the attempted evasion of the law ought not, in my judgment, to receive the sanction of this court.

I have been considering this question as if the relation of principal and security did not exist between Bunn and Whitehead, at the time of the payment of the money; and have endeavored to establish the plaintiff's right to recover, on the ground that the payment to Peck was made by Bunn as the *agent* of Whitehead. Although there was no antecedent authority given to Bunn by Whitehead to make the payment; yet, his *subsequent* ratification of the payment by Bunn, and reimbursing him, was in law equivalent to an *original authority*, and the defendant, with the money in his pocket, could not question his agency, when Whitehead had ratified it. Does the fact that Bunn was the security of Whitehead in the least degree weaken his authority as agent in making the payment to Peck for Whitehead in a legal point of view? I think not; but, on the contrary, greatly strengthens it. The record shows that Whitehead was *principal* and Bunn the *security*, and that Bunn paid the money to Peck as *security for Whitehead.* If Whitehead was the principal debtor, and Bunn the security, and the money was paid by the security to Peck the creditor, such payment was, in contemplation of law, made *for the principal debtor.* "If one person is surety for another, and compellable to pay the whole debt, and he is called on to pay, it is money paid to the use of the principal debtor, and may be recovered in an action against him, for money paid, though the surety did not pay the debt by desire of the principal."—1*st Livermore on Agency*, 52-3; *Toussaint* vs. *Martinnant*, *2d Term Rep.* 104; *Exall* vs. *Partridge*, *8th Term Rep.* 310; *Ponnall* vs. *Ferrand*, *13th Com. Law Rep.* 230. In *2d Kent's Com.* 617, the learned commentator asserts the principle, that " A surety, from his relation to the principal debtor, has an interest and a right to see that the debt be paid: and if he pays to relieve himself, it is money paid to and for the use of the other." If Bunn paid the money to Peck, as the *security* of Whitehead, as the record shows, he paid it *for Whitehead;* and if Whitehead had not reimbursed Bunn, he would have been entitled, so soon as the note became due, to have maintained an action against Whitehead, for so much money paid to Peck *for his use.* The charge of the court evidently proceeds on the ground, that Bunn, when he paid Peck, paid *his own debt*, when in fact he paid it for the *use of Whitehead, his principal,* and would have been entitled, as we have seen, (had it not been paid,) to recover it from Whitehead. If it was Bunn's own debt, he paid to Peck, money which he paid for *himself*, on what principle is it he would be entitled to recover it back from Whitehead? Bunn certainly would not have been entitled to have recovered back his own

money ; money paid *for himself* to Peck, from Whitehead ? The court below asserts as the law, that the security might pay off the whole debt, and recover of the principal, for so much money paid to his use. But if Bunn the security paid it for *himself*, how could he recover of Whitehead, for so much money paid for *his* use ? If Bunn paid the money to Peck for Whitehead as his security, as the record shows he did, then Whitehead is entitled to recover from Peck the amount of usury which Bunn paid him *for Whitehead.* The money which Peck received from Bunn, over and above the principal and lawful interest, was, in legal contemplation, Whitehead's money paid to Peck by Bunn for him, and which, in equity and good conscience, he ought to refund ; and the law raises an assumpsit in favor of Whitehead, and creates a *privity* of contract between Peck and Whitehead, which authorizes the plaintiff to recover in this form of action.—*Camp* vs. *Tompkins,* 9th *Connecticut Rep.* 553 ; *Mason* vs. *White,* 17th *Mass. Rep.* 560 ; *Hall* vs. *Marston,* 17th *Mass. Rep.* 575 ; *Wilson & Co.* vs. *Smith,* 3d *Howard's Rep.* 763. In Camp *vs.* Tompkins it is said, " In the eye of the law, there is always such *privity* of contract as is necessary to sustain this action, between a person who holds the money of another, which in equity and good conscience he is bound to refund, and the person whose money is thus withheld." In Hall *vs.* Marston, which was an action for money had and received, Chief Justice Parker says : " There are many cases, in which this action is supported without any privity between the parties, other than what is created by law. Whenever one man has in his hands the money of another, which he ought to pay over, he is liable to this action, although he has never seen or heard of the party who has the right. When the fact is proved, he has the money ; if he cannot show that he has legal or equitable ground for retaining it, *the law creates the privity and the promise.*" If it be contended Bunn paid the money *voluntarily*, before the notes became due, without authority from Whitehead, it may be answered, Peck received the money *for Whitehead's notes*, and Whitehead, with a full knowledge of the facts, *ratified* the payment made by Bunn, and reimbursed him ; therefore, in judgment of law, the payment was made by Bunn as the *agent* of Whitehead, as clearly, as if Whitehead had in the first instance given Bunn the money to hand over to Peck, on the principle, that the ratification of the act of payment, by Whitehead, is equivalent to an original authority to Bunn, to make such payment. Besides, Whitehead having recognized and ratified the payment made by Bunn, Peck, with the money in his pocket, cannot be heard in denial of Bunn's agency, to make such payment for Whitehead. In my judgment, it would be iniquitous to permit him to do so, for the purpose of defeating this equitable action. If Bunn paid the money to Peck, the creditor, as the *security* of Whitehead, as the record shows he did, then he paid it *for Whitehead*, and Whitehead has reimbursed him. The defendant, Peck, then, has the money of Whitehead, which, under the laws of the country, he ought not to retain, paid to him either by Bunn as his *agent*, or paid to him for Whitehead by Bunn, *his security ;* and not being able to show, " he has either a legal or equitable ground for retaining it, the law creates the *privity* and the *promise*" necessary, to entitle the plaintiff to recover. I am therefore of the opinion the judgment of the court below should be reversed, and a new trial granted.